DUDLEY (GRAHAM v.).    See Case No. 5,-665.

## Case No. 4,115.

### DUDLEY et al. v. The SUPERIOR.

### SEXTON et al. v. The TROY.

[1 Newb. 176;¹ 3 Am. Law Reg. 622.]

District Court, S. D. Ohio.    July 3, 1855.

MARITIME LIENS — MATERIALS AND SUPPLIES — HOME AND FOREIGN PORTS — PRESUMPTION OF KNOWLEDGE—ENROLLMENT—PRIORITIES—WAIVER OF LIEN—STATE STATUTES—MASTER'S WAGES.

1. In a controversy, in which the question is, whether a steamboat was a foreign or domestic boat, at the time the account accrued, for which the libel is filed, the enrollment, made under oath by the managing owner, pursuant to the third section of the act of congress, of the 31st December, 1792 [1 Stat. 287], requiring the enrollment to be made at the port nearest the residence of the owner, is prima facie evidence that the boat belonged to such port.

[Cited in Hill v. The Golden Gate, Case No. 6.492; Collins v. The Fort Wayne, Id. 3,-012; U. S. v. The F. W. Johnson, Id. 15,-179; The Nancy Bell. Id. 9,199; The Albany, Id. 131; The Nancy Dell, 14 Fed. 747.]

2. The proof afforded by the enrollment, in such a controversy, will be held conclusive as to the character of the boat, unless contradicted by clear evidence of the notorious residence of the owner, or owners, at a place or port other than that named in the enrollment.

[Cited in The Rapid Transit, 11 Fed. 329.]

3. When the owners of a boat reside at different ports, the vessel is to be considered a domestic vessel at the port where she is enrolled.

[Cited in The George T. Kemp. Case No. 5,-341; The Ellen Holgate, 30 Fed. 126.]

4. The presumption of the knowledge that a boat belongs to the port of its enrollment, as to those who furnish supplies or materials at that port, is strengthened by the fact that it bears on its stern, in conspicuous letters, as required by the act of congress. the registered name of such boat, with the port to which it belongs, especially when the evidence is, that such boat made several trips weekly, to and from such port.

[Cited in The Samuel Marshall, 49 Fed. 760.]

5. As to those claiming liens on a boat, as for supplies and materials furnished under the circumstances above stated, proof that they gave credit to the boat, as of a port of another state, will not avail, unless they have used ordinary diligence to ascertain its true character, or fraudulent or unfair means have been used to mislead and deceive them, as to the place to which it belongs.

[Cited in The J. W. Tucker. 20 Fed. 131; The Woodward, 32 Fed. 639.]

6. Where a boat has been sold under an order of the court of admiralty, and the proceeds paid into the registry, and the fund is insufficient to pay all the claims against it; on a question of distribution, the claimants will be paid according to their priorities of privilege.    In this case: 1. Claims of seamen for wages; 2. Material men having a lien by the general maritime law; 3. Material men having a lien by virtue of a

¹ [Reported by John S. Newberry, Esq.]

seizure under a state law, without reference to priority of seizure.

[Cited in Srodes v. The Collier, Case No. 13,-272; The St. Joseph, Id. 12.229; The General Burnside, 3 Fed. 229: The J. W. Tucker. 20 Fed. 134; The Lady Boone, 21 Fed. 733.]

7. A claimant, having an original admiralty lien, who has proceeded under a state law, in a state court, to enforce it. will be deemed to have waived such original lien, and must rely solely on the lien acquired by the seizure under the state law.    He cannot resume it at pleasure, and thus be reinstated to his original rights.

[Applied in Stapp v. The Swallow, Case No. 13,305: Cited in The D. B. Steelman, 48 Fed. 5 2. Explained in The Cerro Gordo, 54 Fed. 393.]

8. For supplies furnished, or repairs made to a boat belonging to another state. there is an undoubted admiralty lien, equivalent to an hypothecation of the boat; but for repairs and supplies at the home port, there is no lien, unless given by the state law.

9. It is competent for a state to provide such a lien, and the national admiralty courts will execute a state law for such a purpose; but state legislation cannot supersede or destroy a lien acquired by the general maritime law.

[Cited in Harris v. The Henrietta, Case No. 6,121.]

10. A master of a boat or vessel has no lien for his wages as such.

[These are two cases in admiralty,—the first, Stephen Dudley against the steamboat Superior, being a libel for supplies and materials, while the second, James M. Sexton against the steamboat Troy, is a libel for wages.]

John Ganson and D. O. Morton, for libelants.

Passett & Kent and Willey & Cary, for respondents.

LEAVITT, District Judge. The question before the court in these cases being substantially the same, it is not deemed necessary to give them a separate consideration. The principles to be settled apply alike to both, and will be carried out in the decrees to be entered, although the facts of each case are not wholly identical.

In the first-named case, the libelants filed their libel in this court on the 28th of October, 1853, claiming a balance of $1,375.97, for supplies and materials furnished at the port of Buffalo, in the state of New York, averring that the Superior, during the period included in the account, was running between ports and places on the shores of lake Erie, lying in different states, and that she belonged to a port in Ohio. Many intervening claims—upwards of forty in number, and amounting, in the aggregate to $22,654.-23, have been filed under the original libel, consisting of claims for seamen's wages, repairs, supplies and materials, and one by mortgage. The interveners are residents of either Ohio, or New York, with the exception of one residing in Erie, in the state of Pennsylvania. Under the original libel in

the case of the Troy, there are some forty interveners, all residents of Ohio and New York, whose claims amount in the whole to $17,728.11, and embrace the same classes and descriptions as those against the Superior. Without detaining to notice the previous proceedings and orders in these cases, it will be sufficient here to state, that at the April term, 1854, of this court, by the consent of all the parties in interest, an interlocutory order was entered for the sale of these boats, and directing that the proceeds should be paid into the registry, subject to the future order of this court, for their apportionment and distribution. At the succeeding October term, the marshal returned, that the Superior had been sold for $5,700, and the Troy for $6,610; the amount in each case being altogether insufficient to satisfy the claims exhibited respectively against them. From the number and diversified character of the claims presented, and the complicated questions of priority likely to arise in the distribution of the proceeds, at the October term, A. D. 1854, upon the application of the parties, the cases were referred to H. B. Carrington, Esq., as a special commissioner to inquire into and report upon the character of the various claims exhibited and the order of their priority. The commissioner, in the discharge of his duties, at the late term of this court, submitted a full and elaborate report on the various matters referred to him, which from its fullness and general accuracy, has greatly aided in the right understanding of the claims and interests of the contending parties.

The questions now before the court for its decision, arise on exceptions to the findings and conclusions of the commissioner.

The first inquiry presented, and one which most materially affects the standing and interest of these parties, in a court of admiralty, relates to the port or place to which these boats belonged, during the periods embraced in the accounts now presented as maritime claims. The commissioner has reported, as his conclusion, from the evidence before him, that from the autumn of 1852 till the 5th of June, 1853, they belonged to Buffalo, in the state of New York, and that from the last-named dates they were Ohio boats. As the result of this finding, the claimants residing at Buffalo, whose accounts run from the fall of 1852 till the 5th of June following, would be domestic creditors, and as such, would have no maritime lien on the boats, other than that given by the local laws of New York and Ohio. On the other hand the creditors resident in Ohio, whose accounts run during the time stated, would be foreign creditors, and as such, have a lien under the general maritime law. The facts on which the commissioner bases his conclusions, as to the character of these boats may be briefly stated as follows: The Superior was purchased by William H. Forsythe, at Buffalo, in the fall of 1852, and was fitted out and equipped at that place under his immediate superintendence, during the winter and early part of the spring following. It was enrolled at Buffalo, as of that port, on the 5th of March, 1853, and subsequently, on the 2d of May following, as of the same place. These enrollments were made by Forsythe, the principal owner, under oath, in accordance with the third section of the act of congress of the 31st of December, 1792, which requires among other things, that the enrollment shall be made at the port nearest the residence of the owner. Forsythe, at the time of the enrollments, had the sole management of the boat; his coproprietor residing at Cleveland, in the state of Ohio. After it was equipped and enrolled, as required by the act of congress referred to, the name was put on its stern, as follows: "Superior, of Buffalo." Early in June, 1853, it ceased to run to Buffalo, and from that time was employed in running from Cleveland and Toledo in Ohio. The Troy was also enrolled at Buffalo, the 26th of October, 1852, as of that port, upon the oath of Forsythe, as the managing owner, having at the time an interest of three-fourths in the boat; the other fourth being owned by a resident of Buffalo. Upon the stern the words, "Troy, of Buffalo," were conspicuously painted. It had been previously enrolled as of Toledo, Ohio; changes in the enrollment having been made after the purchase by Forsythe and his co-owners. In October, 1853, both the boats were mortgaged by Forsythe, and the mortgage was recorded at Buffalo.

In addition to the foregoing facts, bearing directly on the question of the character of these boats during the period referred to, the depositions of several witnesses were taken, in relation to the residence of Forsythe, the principal and managing owner of the boats. From these depositions, it appears, that Forsythe at the time was an unmarried man, of somewhat irregular habits; and although his parents resided in Ohio, he seems not to have had any fixed or notorious residence. It is not, strange, therefore, that there should be some conflict in the evidence, touching his residence. I do not propose to analyze this evidence with a view to show in what direction the scale preponderates. It is sufficient to state, that in so far as Forsythe may be deemed to have had any place of residence during the period in question, the weight of the evidence sustains the conclusions of the commissioner, that it was at Buffalo. It is true the oral testimony of Forsythe on the hearing, if accredited, would lead to a different result; but, for reasons not necessary to be stated, but which will be obvious to those acquainted with the facts, the court cannot do otherwise, than to view his statements as wholly unreliable. Under the circumstances of this case, it is clear the enrollments of these boats are prima facie evidence, that they belonged to the port of

Buffalo at the time of their registry. It is true, in controversies between the owners of a vessel, involving a question of title merely, the enrollment is not even prima facie evidence. When offered to show title or proprietorship in the person making it, it is wholly inadmissible as evidence, for the reason that it is proof only of his acts, and cannot be received against other parties. But, upon an incidental question, not affecting the title of the parties, it is competent evidence; and unless contradicted by clear evidence, will be held conclusive as to the port or place to which the vessel belongs. Evidence of the notorious residence of the owner, at a place different from that stated in the enrollment is doubtless admissible, and may be available in contradiction of the enrollment. But, in this case, there is no proof for which this effect can be fairly claimed. In the case of Tree v. The Indiana [Case No. 14,165], the enrollment seems to have been regarded as conclusive evidence of the port to which the vessel belonged. The facts were briefly these: The vessel was built and owned in New Jersey, and was enrolled by the owners at Egg Harbor, in that state, as of that port. Subsequently, a citizen of Philadelphia purchased a part of the vessel, and, on this change of ownership, it was enrolled at that place and as of that port; the other owner still residing in New Jersey. It was insisted that it belonged to that state; but the court held, that from the date of the enrollment at Philadelphia, the vessel was of that port, and not of the port in New Jersey, where a majority of the owners resided. It is urged, however, that the creditors of these boats, residing at Buffalo, aided in the repairs, and furnished supplies and materials, under the belief that they were foreign and not domestic boats, and that they are to be regarded, in a controversy touching their interests as creditors, as having the character which they supposed them to possess. This is doubtless the true doctrine, if fraud or unfair means have been used to lull the vigilance of the party giving the credit. or mislead or deceive him, in respect to the real character of the boat or vessel. There is, however, no evidence in this case, that any such means were resorted to. It is true a card purporting to have been issued by Forsythe and another person, announcing that they had commenced the forwarding and commission business at Cleveland, in the state of Ohio, has been offered in evidence. It is not material to decide whether this can be received as evidence, unaccompanied with proof bringing home the knowledge of such business arrangements to the persons giving the credit at Buffalo. There is no proof of this character offered, and no ground therefore for the inference or presumption, that the card referred to could have misled them in reference to the character of the boats as foreign or domestic. The enrollments of the boats were of record in the custom-house at

Buffalo; and slight diligence would have enabled those interested to know to what port or place they belonged. Besides, these boats during that part of the season of navigation in which they were engaged in the Buffalo trade, arrived at, and departed from that port, several times every week, bearing on their sterns the significant announcement, and giving to all a standing notification that they belonged there.

The evidence, therefore, clearly warrants the conclusion that these boats did, in legal estimation, belong to Buffalo up to the 5th of June, 1853, when it was notorious they were wholly withdrawn from that trade, and were thenceforth, during that season, employed between ports and places within the state of Ohio. As a consequence, those who aided in repairs, or furnished supplies and materials at Buffalo, prior to the 5th of June, can be viewed, under the circumstances, in no other light than as domestic creditors, and as such, have no other lien, other than that given by the statutes of New York and Ohio. Subsequent to that date, they occupy the position of creditors of foreign boats, and their rights as such will be recognized and enforced. And, as a further result, the Ohio claimants, whose accounts date from the time of the enrollments of these boats to the 5th of June, 1853, occupy the standing of creditors of foreign boats, and as such, have a clear admiralty lien, which will be enforced as to those who have not waived such lien by resorting to the local law of Ohio for the recovery of their claims. From the report of the commissioner, it appears that many of the Ohio creditors who, in accordance with the conclusion just stated, had a clear maritime lien on the boats, independent of that given by the local law, have proceeded to obtain seizures of the boats under that law, and by process from the state courts. They have included in their claims, not only materials, supplies, etc., furnished those boats, while they were, to them, boats of a home port, but also such as were furnished while they were of a foreign port. I have found no reported case settling decisively the effects on the right of a party having an admitted admiralty lien, who voluntarily waives that lien, and resorts to the local law for his indemnity and protection. There can be no question of his right to do so; but I suppose, in analogy to the doctrine of waiver, as applicable to other cases, that the party thus abandoning his maritime lien, as before stated, cannot resume it at pleasure, and thereby be reinstated in his original rights. Without knowing how or to what extent this principle may affect the interests of the numerous claimants in these cases, I am inclined to sustain it; and the decree to be entered will be framed accordingly.

In this posture of these cases, the important question arises, on what principle is the distribution of the proceeds in the registry to be made? Concerning the claims for seamen's

wages, there is no controversy. It is conceded they must be first paid out of the funds on hand. The next class in the priority of privilege are the material men. As before stated, some of these are residents of Ohio, some of New York, and one of Pennsylvania. Some claim as the creditors of a foreign boat, and rely on their general admiralty lien; and some claim under liens acquired by virtue of the laws of Ohio. The proceeds in the registry, it appears, will not pay more than fifty per cent. of the claims reported by the commissioner as constituting liens on the boat. After paying seamen's wages, the commissioner has adopted the conclusion that the material men, whether having original admiralty liens, or liens acquired by seizure under the statute of Ohio, occupy the same rank of privileges, and must be paid pro rata, so far as the proceeds will reach. And this view is concurred in by the proctors representing a large number of the claimants. The question here indicated is certainly one of great interest, and I regret to say, I am aware of no authorities bearing directly on it. In some of its aspects, as applicable to the present case, the pro rata rule of distribution insisted on seems just and equitable; and I would cheerfully adopt it, if it did not conflict with what I suppose to be the settled doctrines of the maritime law. I am not prepared for, and therefore shall not attempt an extended discussion of the principles involved in the inquiry before stated. I shall content myself with a very brief statement of some of the reasons which occur to me against placing all the material men who are claimants in this case on a footing of equality, and applying to all the pro rata rule of distribution. It is obvious to me that there is a clear distinction between those claimants for repairs made, or supplies and materials furnished to these boats, as boats of a foreign port or state, for which a lien or privilege attaches by virtue of the general maritime law, and those which exist only by seizure under the local law of a state. The former have their origin in the fact, or the presumption of the fact, that the credit is given, not to the owner or master, but to the vessel; and by the admitted doctrine of the maritime law, it attaches from the time the credit is given, and is equivalent to an express hypothecation of the vessel. It adheres to the res as a subsisting and efficient lien, wherever it goes, and into whosesoever hands it may pass. Not so, however, in regard to credits given in a home port. These are supposed to be on the credit of the master or owner, and do not import a lien on the vessel, unless provided by express legislation of the state in which the credit is given, and on grounds unknown to the general maritime law. The right of a state thus to legislate has long since been conceded by the highest courts of the Union; and it is equally well settled, that when such a lien is created by a state law, it may be enforced in the admiralty courts. But I am not aware that it has been anywhere admitted that state legislation can interfere with, supersede or destroy a right or lien previously acquired under the national maritime law. On the contrary, the existence of such a power in the states has been strongly denied. They may declare that a lien shall exist in cases designated, and provide for its enforcement by a seizure in rem; but, clearly, the lien so acquired must be subordinate to those existing before, in favor of other parties. Under the water craft law of Ohio, there is no lien, till after the seizure of the thing. To hold that this lien places the attaching creditor on a footing of equality with one who has an admitted maritime lien on the same vessel, would be virtually to set aside the claim of the latter, and wholly to defeat his right. Such, at least, in cases like the present, where the proceeds of sale are not sufficient to pay all the claims against the vessel, would be its virtual effect. I cannot suppose that such a result was intended by the Ohio statute; but if admitting of such a construction, it implies the exercise of a power by the legislature, in conflict with the constitution and laws of the United States.

But, without pursuing this subject further, I will state, as the result of my reflections on the question stated, that in determining the mode of distribution of the funds in the registry, there must be a discrimination in favor of those claimants who have a subsisting maritime lien, and those who subsequently acquired liens by seizure under a state law. There is certainly a fallacy in the argument by which the conclusion is reached, that because those having these statutory liens, are material men, they are to have the same priorities of privilege as those who have previous maritime liens. The origin and nature of these liens, must be regarded in fixing on a rule by which distribution of the proceeds shall be made. Such I understand to be the rule sanctioned by the learned judge of the district court of Maine, in the case of The Paragon [Case No. 10,708]. He says, "Where all the debts hold the same rank of privilege, if the property is not sufficient fully to pay all, the rule is, that the creditors shall be paid concurrently, each in the proportion to the amount of his demand. But, when the debts stand in different ranks of privilege, then the creditors who occupy the first rank, shall be fully paid, before any allowance to those who occupy an inferior grade." Being as I think, warranted in the conclusion, "that the class of claimants, in whose favor there existed a present valid maritime lien, are entitled to a priority in the disposition of the funds in the registry, I shall decree, that such be first paid, without reference, as between them, to the order of time in which their claims respectively accrued. After excluding those claimants who have abandoned their maritime liens, by resorting to seizure under a state process, there will be but a small number,

occupying the first rank of privilege, among the material men. It appears, however. from the analysis of the claims submitted by the commissioner. that there are some of this description. These will be ascertained by reference to the report; and full payment will be decreed to them, so far as they have admiralty liens. The claim of George F. Morton, of Erie. Pennsylvania, the boats being foreign to him, will be included in the class of privileged claims to be first paid. The claims for seamen's wages, and the preferred class of material men being provided for in the decree, those who have acquired liens by seizure under the laws of Ohio, will constitute the next class. These will be paid pro rata, from the funds remaining, without reference to the order of time in which the seizures were made. It is proper to notice that the claim of James M. Sexton, the original libelant in the case of the Troy, embraces an account for wages, as master of the boat, and also as mate. It is clear, that upon no principle has the master a lien on the vessel for his wages. This part of the claim is therefore rejected, and the decree will embrace only the amount due him for wages as mate.

These are the only material points presented on the exceptions to the report of the commissioner. A decree in each of the cases will be entered in accordance with the principles before stated. The libels filed by interveners having neither an admiralty lien or a lien by seizure under the Ohio statute, are dismissed at the costs of the libelants.